

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-26-00055-CV

———————————————————

IN THE INTEREST OF B.A. AND B.A., CHILDREN

On Appeal from the 325th District Court
Tarrant County, Texas
Trial Court No. 325-744365-23

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

The trial court terminated the parental rights of J.G. (Mother) to her children B.A. (Braelyn) and B.A. (Brian).[1] In three issues, Mother argues that the evidence was legally and factually insufficient to support the trial court's termination-ground findings under Subsections (D) and (E) of Texas Family Code Section 161.001(b)(1) and the best-interest finding under Section 161.001(b)(2). Because we hold that sufficient evidence supports the termination of Mother's parental rights, we will affirm.

## Background

Mother and the children's father (Father) began dating in 2017. Braelyn was born in November 2020, and Brian was born in September 2023.

The Department became involved with the children in June 2024 through its Family Based Safety Services (FBSS) division; in late June, the parents agreed to a safety plan. Soon thereafter, the Department closed the FBSS case, took the children into its care, and filed this child-protection suit. Trial was held over five days spread over four months—June 2025, August 2025, September 2025, and January 2026. At trial, the Department introduced evidence that Father committed violence against

---

[1]To protect the children's identities, we use aliases for the children, their parents, and anyone else through whom the children could be identified. *See* Tex. R. App. P. 9.8(a), (b).

Mother, which she minimized, and evidence that Mother had used illegal drugs, which she denied.

## I. Father had a history of violence—of which Mother was aware—before the Department's involvement.

Regarding Father's history of violence, the Department presented evidence that he had committed violence against Mother on numerous occasions and that, as she was aware, she was not the only target of his behavior.

### A. In 2018, Father commits acts of violence against multiple people, including Mother.

The first incident of violence against Mother that was referenced at trial occurred in 2018. However, the trial testimony provided no details about the incident. Mother testified that she "wouldn't say it was domestic violence" and relayed what she had previously told the FBSS caseworker—that she had pushed Father when they were "in a debate." The FBSS caseworker, on the other hand, agreed that Mother had "admitted to violence in 2018"[2] and stated that Mother had told her that "something had happened with her eye."

But while the Department provided only vague statements to show that Father had committed violence against Mother in 2018, the Department presented more

_____

[2]Although this statement could be read as Mother's claiming that she, not Father, had been violent, it was made as the caseworker responded to questions about Mother's downplaying Father's violence and as the caseworker expressed her concern that Mother would not be protective of the children.

3

clear and specific evidence that he had committed other acts of violence that year and that Mother should have been aware of those acts.

The Department's evidence showed that Father had been indicted for two counts of aggravated assault with a deadly weapon committed in 2018. The evidence further showed that

- under a plea agreement, Father was placed on deferred adjudication in 2019 for the lesser-included offenses of discharging a firearm at a vehicle;

- as part of the plea agreement for one of those deadly-conduct cases, he entered a plea in bar to two other counts of aggravated assault with a deadly weapon

- one of those other offenses had been committed against C.P., the father of Mother's older children,[3] and the other was committed against C.P.'s mother;

- the State agreed not to prosecute those two counts, and Father admitted his guilt to them and asked the trial court to consider them in assessing his sentence for the deadly-conduct charge.

Mother was questioned at trial about these offenses, but she seemed to have little information about them:

- When asked about Father's altercation with C.P.,[4] Mother claimed that it had happened outside the home while she was inside, that she heard the shooting, and that she did not go outside to see who was shooting.

---

[3]Mother had two older children. When trial began, one was nine, and the other was nearly ten. Mother testified that they were both living with C.P.

[4]When Father was asked at trial what he had done to C.P., Father replied, "I didn't do nothing." But he acknowledged that he had admitted his guilt to that offense.

4

- When Mother was asked if she was aware of whether Father had been arrested for that incident, she responded, "They just said he had a warrant, but they didn't say for what." She "just figured [that his arrest] was due to the situation that occurred" but did not ask him about it because there "was a lot going on at that time." She did not elaborate.

**B. In 2019, the police are called to another incident with Father.**

In August 2019, police were called to an incident between Father and Mother. Mother downplayed the incident at trial:

- She testified that a neighbor had called the police because she heard them having "a debate."

- She acknowledged that she had been seen by EMTs, but she denied that she had been injured, and she said that if the police report stated that she had been bleeding from the top of her head, "that would be false."

- She had not filled out the family-violence packet given to her by the police at the time because "nothing happened."

In further questioning, however, the police report from the incident was read to Mother, and she acknowledged that what she had reported to the police that day had been true. The report, which the trial court admitted, stated that Mother had been bleeding and recited the explanation that she had provided at the time:

- Officers saw bleeding from "what appeared to be a cut to the top of [Mother's] head."

- Mother had been initially uncooperative, but she eventually told police that she and Father had begun arguing because he believed that she was cheating on him.

- She went outside to leave, and Father followed and resumed the argument, "after which [he] shoved [her] on her chest, to which [she] responded by pushing [him] back. [Mother] stated that this back and

forth happened around four to five times before the last shove from [Father] knocked [her] on the concrete." Mother believed that this fall was how she had injured her head, but she was not sure.

- Father's version of events to police was that he and Mother "had been taking several Xanax pills throughout the night and . . . that [she had] tripped and f[allen] while attempting to enter the residence." Father "could not explain the injuries to [Mother's] head."

Also in 2019, Mother learned that Father had previously committed assault against the mother of his other children. The offense occurred in 2015, and Father had been adjudicated guilty in 2016 and sentenced to 34 days' confinement in the county jail. After Mother was told about it by "their family members"[5] in 2019, she never asked Father about it.

### C. In 2023, Father violates his community supervision.

In 2023, after violating his community supervision conditions, Father was adjudicated guilty for the two deadly-conduct charges for which he had been placed on deferred adjudication in 2019. He and Mother were still in a relationship at that time. At trial, Father admitted that he had a history of "getting deferred adjudication . . . and then violating [his] probation."

### D. In 2024, police are called to two incidents of violence by Father against Mother

In April 2024 and then again the next month, Father committed violence against Mother, but Mother minimized both incidents at trial.

---

[5]Although it is not entirely clear to whom "their" referred, the context suggests that Mother was referring to family members of Father and of the other woman.

The April incident occurred when Mother took the children to the home of Father's mother (Paternal Grandmother). According to a police report, Father arrived with another woman with whom he "was allegedly cheating on" Mother, and she and the other woman argued. When Mother got into her car to leave, Father broke one of her car's windows with his fist.

In her trial testimony, Mother stated that "[n]othing happened to" her that day except "a cut or something on [her] thumb" that "could've . . . been from the [broken] glass" when she got out of the car. However, in cross-examination, Mother was read an incident report—which contained a considerably different description of the events—and she acknowledged that what she had reported to the police that day was true. The report, which the trial court admitted, stated:

- Mother told officers that after Father broke the window, he "then climb[ed] into the car[,] . . . force[d] the vehicle into park[,] and then f[ou]ght[ ] with [her] inside the car."

- Father pulled Mother out of the car "and, according to her, slam[med] her on the ground." Mother also told officers that "she believe[d that Father had] bit[ten] her on the right ear[,] causing a cut and causing her to feel pain."

- Mother had "visible injuries and blood on both her right knee and right ear."

Neither parent testified that the children had witnessed the incident, but they were apparently present, given that Mother had brought the children there.

The next month, on May 25—by which time Mother had, she claimed, ended their romantic relationship—Father assaulted her in the home, leading her to call 911. As with other incidents, Mother minimized the incident at trial:

- The FBSS caseworker testified that when she had spoken to Mother about this incident, Mother said that she and Father had been "in a debate."

- In her trial testimony, Mother did not fully describe what had occurred; she said that she "c[ould]n't remember too much" and that she thought "he had pushed [her] into a wall or something." She also acknowledged that he had flipped over the couch and broken her laptop.

- In questioning at trial, though, Mother acknowledged that she had been taken to the hospital because she had a knot on her head. She also acknowledged—after being shown photographs—that she had marks on her neck that had been made by Father.

- After being read the police report, Mother admitted that she had told police that Father had bitten the top of her head, kicked the bathroom door off its hinges, punched her in the rib cage several times, and choked her. She admitted that these statements to police officers were true.[6]

According to Father's trial testimony, Mother posted his bail after he was arrested for assaulting her.[7] Mother admitted that the children had been home at the time of Father's assault, but she claimed that they were asleep in another room—apparently despite any noise from Father's overturning furniture and kicking a door

[6]The report further stated that Mother told an officer that she believed that Father "was going to throw [Brian] but that he 'does that all the time.'" At trial, she denied making that statement to police. That statement was not included in the part of the report that was read back to her at trial and that she admitted was true.

[7]Mother acknowledged that she had posted his bail several times.

off its hinges. When asked why her testimony had minimized Father's violence, she claimed that she "didn't recall" what had happened until the police reports were read to her because it had "been years" and she had suffered a concussion.

As a result of the May 2024 incident, the Department became involved with the children, and in June 2024, the Department and the parents established a safety plan. Under that plan, Mother agreed that her godparent (Godparent) would stay with her at her home and supervise her possession of the children. Father agreed that he would not return to the home, he would work services through FBSS, and his visits with the children would occur in a public place.

## II. The parents violate the FBSS safety plan, and the Department files this suit.

On June 30, Godparent called the supervisor on the FBSS case and reported that an altercation had occurred between Mother and Father. Godparent had gone out of town, and under the safety plan, Mother and the children were supposed to have gone along, but they had stayed behind instead. Mother and the FBSS supervisor presented conflicting information about what had happened between Mother and Father:

- The FBSS supervisor testified that after receiving Godparent's report, she spoke to Mother over the phone, and Mother said that Father had assaulted her and had taken the children at gunpoint using Godparent's gun, which had been in the home. The supervisor called 911.

- At trial, however, Mother said that Father had not taken the children from her at gunpoint; "[h]e just took the kids." She had no concerns about Father's behavior that day—"it was all allegations that did not happen."

9

The FBSS supervisor also called Father, and he admitted that he had taken the children to Paternal Grandmother's house.[8] He claimed that he had taken the children because Mother and a friend were outside Mother's home using drugs. Father called the FBSS supervisor again later and told her that he "needed help right away. He stated that he needed to start his classes and that he was a danger to himself and a danger to others."

On July 1, 2024, the Department filed its petition in this case and sought emergency removal of the children. Later that day, Father had an altercation with the police that led to his being arrested:

- No witness fully explained what happened between Father and the police on July 1, but police reports from that day state that Father had called the police and made threats to kill himself and Mother—although she testified that she was not actually at the scene at the time—and that officers arrived at the scene and eventually arrested him.

- These reports align with the FBSS supervisor's testimony that Father had threatened to kill himself and police officers.

- Mother testified that this event occurred after she told Father that the children had been removed, at which point he "lost it."

---

[8]It is not entirely clear how long both children were with Paternal Grandmother. The FBSS supervisor testified that "nobody was being honest about where the children were, except [Father] was the one [who told her] that one child was with [Mother] and one child was with [Paternal Grandmother]." The FBSS supervisor subsequently clarified that Father had originally taken both children to Paternal Grandmother, but the next day, only one child was still there, despite Paternal Grandmother's telling her that she had both children.

In April 2025—after the Department had filed this child protection suit but before trial—Father was placed on deferred adjudication for his May 2024 assault of Mother. As part of his sentencing, Father entered a plea in bar regarding the three offenses that he had been charged with as a result of the July 1 incident: assault of a public servant, harassment of a public servant, and obstruction or retaliation. As part of that plea, Father admitted his guilt for the July 1 offenses and asked the trial court to consider them in his sentencing for the May 2024 assault.

### III. Mother kept seeing Father, even after the Department's involvement.

Even after the Department took the children into its care, Mother and Father apparently continued to spend time together. In September 2024, they were together when they were both arrested, with Mother being charged with possession of methamphetamine.[9] At trial, both Mother and Father denied that the drugs were hers,[10] but the drugs were found in the trunk of her car, which he was driving at the time of their arrest.

---

[9]The Department states in its brief that Father was also arrested for possession, but although that may be the case, the record references it cites to support that statement relate only to Mother's possession charge. Father was asked at trial why he was arrested, and he replied that it was "[s]omething about criminal mischief." He said that when he had been arrested on July 1, "they didn't charge [him] with everything, and then on that day when [he] got pulled over, they said that another charge had popped up from—when [he] went to jail July 1st, [and] it was like criminal mischief or something." He did not explain why police had stopped them in the first place.

[10]Father said, "[I]t was mine, but it wasn't meth. . . . I guess there was meth in it, but it was like X pills."

Mother testified that she had learned in her services during the case that Father had been abusive to her, and she discussed what she had learned in her counseling about recognizing controlling behavior and the importance of setting boundaries. She talked about one example of her setting boundaries: one night, she heard someone banging on her door, and she thought it might be Father, but instead of opening the door, she called 911.[11] Further, Mother stated that she learned in counseling that she had stayed with Father too long. But if the counseling helped Mother resolve to keep away from Father, that boundary did not last. At the third hearing, held in September 2025, the Department moved to reopen evidence to introduce arrest reports and police bodycam videos showing that Father had been arrested for driving while intoxicated earlier that month and that Mother had been with him at the time.

The trial court granted Mother a six-day continuance to review the new evidence. Before trial resumed again the next week, Father died.[12] The trial court once again continued the trial to give Mother and the Department time to "reassess what the best possible outcome here is" and to decide whether they preferred the trial court to render a decision in the case or for them to "come to some other kind of agreement."

---

[11]She did not, however, tell the Department's caseworker about the incident.

[12]The parties did not introduce evidence of the cause of death.

The parties apparently did not reach an agreement, and trial resumed in January 2026. The trial court admitted the records and bodycam footage from Father's September 2025 arrest for driving while intoxicated; those records stated that he was also charged with possession of marijuana, resisting arrest, and obstruction or retaliation. The bodycam video confirmed the Department's assertion at the previous hearing that Mother had been with Father in the car at the time.[13]

## IV. The Department presented evidence of drug use by both parents.

The Department presented evidence from which the trial court could have found that Mother and Father had both used drugs. First, as noted above, Mother was arrested in September 2024 for possession of methamphetamine. She claimed at trial that she had not known that the drugs were in the trunk of her car. At the time of her arrest, she and Father both told police officers that the drugs had been in a bag in the trunk for over a year. Mother acknowledged that the car smelled like marijuana at the time of her arrest, but she blamed the smell on someone else who had previously been in the car.

After Mother's arrest, the Department requested that she submit to drug testing, and she participated in multiple urine drug tests throughout the case. Her

---

[13]Mother stated in the video that the car that Father had been driving was hers. Further, an officer asked her if Father normally "talk[s] like that" because "he sounds intoxicated," and Mother responded, "I asked him that, too, when I got up this morning, because he got up before me." If she was speaking truthfully to the officer, then her statement indicates that, at the least, she and Father had spent the night together.

urine tests submitted in September and October 2024 were negative for most substances but positive for marijuana. Her subsequent urine tests were all negative.

But Mother also submitted to hair-strand testing in September 2024, and that test was positive for not only marijuana but also for cocaine and methamphetamine. *See In re N.S.M.*, No. 01-20-00764-CV, 2021 WL 1217328, at *6 (Tex. App.—Houston [1st Dist.] Apr. 1, 2021, pet. denied) (noting that "[i]t is not uncommon for a person to contemporaneously submit a urine sample that is clean and a hair sample that shows drug use due to the differing timeframe of use that each method of testing is capable of detecting"). In January 2025, Mother again tested positive in a hair-strand test to marijuana, methamphetamine, and cocaine, as well as a cocaine metabolite. An April 2025 hair-strand test was negative for all substances.

Amanda Rountree, the caseworker assigned to the case after the children had been taken into care, testified that she was concerned because Mother would not admit to using cocaine or methamphetamine, but she also would not or could not provide an alternative explanation; she "couldn't tell [Rountree] who she could have been around or what environment she was [in] where she was exposed to these drugs." By the time of trial, however, Mother did have an explanation: she blamed the positive methamphetamine and cocaine tests on exposure from having been in the same room in which someone had used drugs—specifically, Paternal Grandmother; Mother said, "[s]he'll probably just be finishing and I'll walk in her room."

14

Father also had a positive drug test during the case. His February 2025 hair-strand test was positive for cocaine,[14] methamphetamine, and a metabolite of heroin. Father testified that he did not know why the test was positive, claiming that it must have been "something [he had] touched in jail or something."

## V. The trial court did not find Mother credible and terminated her parental rights.

At the conclusion of trial, the trial court found the predicate termination grounds in Subsections (D) and (E) and that termination was in the children's best interest. In announcing its ruling, the trial court stated that throughout the case and during the trial, Mother had demonstrated a pattern of dishonesty, and the court further expressed concern about her "decision-making capabilities[ and] her abilities to keep the children safe." The trial court further stated that Mother had "put[ ] 100 percent of the blame of the reason the children were in care on [Father], and she's still not taking any responsibility for it, has also not changed her thinking"; that "while [M]other has a stable home or placement, the [c]ourt has no confidence that the home will stay that way due to Mother's inability to make safe decisions, not only for herself but for the children"; and that Mother had "demonstrated that she cannot meet the emotional and physical needs of the children." Mother now appeals.

---

[14]Father had a 2016 conviction for a 2012 possession-of-cocaine offense.

## Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one predicate ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless it is conclusive. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole

judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

To determine the factual sufficiency of the evidence, on the other hand, we must perform "an exacting review of the entire record" to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the termination ground and that termination would be in the child's best interest. *In re A.B.*, 437 S.W.3d 498, 500, 502–03 (Tex. 2014); *see* Tex. Fam. Code § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19. But if a factfinder reasonably could not—because the disputed evidence that could not reasonably support the finding is too significant—then the evidence is factually insufficient. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). As with the legal sufficiency standard, the factfinder is the sole judge of the witnesses' credibility and demeanor, *A.B.*, 437 S.W.3d at 503, and we give due deference to the factfinder's findings, *H.R.M.*, 209 S.W.3d at 108.

## Discussion

### I. Predicate Termination Grounds

Mother argues that the evidence was legally and factually insufficient to show endangerment under Subsections (D) or (E) because there was no evidence that the children "suffered any physical or emotional trauma in regard to the domestic violence," which she claims they never mentioned; because her positive drug tests for

cocaine and methamphetamine were due to her being around drug users, not her own drug use; and because her negative urine and hair-strand tests in April and July 2025 show that her services had assisted her in learning to cope with any desire to use marijuana or any other drugs.

## A. Endangerment Grounds

Subsections (D) and (E) address child endangerment. "Endanger" in this context "means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The term "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012) (quoting *Boyd*, 727 S.W.2d at 533). But the endangering conduct need not be directed at the child, and the child need not actually suffer injury. *J.F.-G.*, 627 S.W.3d at 312 (quoting *Boyd*, 727 S.W.2d at 533).

Subsection (D) addresses endangering environments. Tex. Fam. Code § 161.001(b)(1)(D). It authorizes termination when a parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the child's physical or emotional well-being. *Id.* Because conditions and surroundings cannot endanger a child who is not exposed to them, the relevant time frame for evaluating endangerment under Subsection (D) is before the child's removal. *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022). A parent's conduct in the home and the suitability of a child's living conditions are relevant considerations in a Subsection (D)

18

analysis. *Id.*; *In re Z.R.*, No. 02-25-00268-CV, 2025 WL 3181160, at *7 (Tex. App.—Fort Worth Nov. 13, 2025, no pet.); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Subsection (E) focuses on endangering conduct. Tex. Fam. Code § 161.001(b)(1)(E). It authorizes termination when the parent engaged in conduct that endangers the child's physical or emotional well-being or knowingly placed the child with persons who engaged in such conduct. *Id.* "As a general rule, conduct that subjects a child to a life of uncertainty and instability" endangers the child's physical and emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). A Subsection (E) finding generally may not be based on a single act or omission; rather, it requires "a voluntary, deliberate, and conscious course of conduct." *J.T.G.*, 121 S.W.3d at 125; *Z.R.*, 2025 WL 3181160, at *7.

### B. Endangering Conduct and Environment

Evidence of domestic violence against a parent can in some cases support an endangerment finding. Abusive or violent conduct by a parent can produce an environment that endangers a child's physical or emotional well-being, and thus a parent's decision to continue living with someone who has committed domestic violence can support a Subsection (D) finding. *In re E.A.*, No. 02-24-00535-CV, 2025 WL 1085189, at *10 (Tex. App.—Fort Worth Apr. 10, 2025, pet. denied). "The factfinder may consider domestic violence and a propensity for violence as evidence of endangerment, even if the violence did not occur in the children's presence, was

19

not directed at the children, or did not physically injure the children." *Id.* Likewise, a parent's continuing relationship with an abuser can support a Subsection (E) finding. *See In re D.D.D.*, No. 01-23-00078-CV, 2023 WL 4872399, at *11 (Tex. App.—Houston [1st Dist.] Aug. 1, 2023, no pet.); *In re N.E.*, No. 01-22-00739-CV, 2023 WL 2530197, at *9 (Tex. App.—Houston [1st Dist.] Mar. 16, 2023, pet. denied).

A parent's involvement with illegal drugs may also support an endangerment finding under Subsection (D) or (E). A parent's illegal drug use "exposes the children to the possibility that the parent may be impaired or imprisoned." *In re J.S.*, 687 S.W.3d 541, 551 (Tex. App.—Eastland 2024, no pet.). While illegal drug use is not necessarily, by itself, enough to show endangerment, "a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm," and a reviewing court should consider drug-use evidence along with other evidence "that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024) (quoting *J.O.A.*, 283 S.W.3d at 345); *see R.W.*, 129 S.W.3d at 739. For example, "[w]hen a pattern of drug use is coupled with credible evidence of attendant risks to employment, housing, and prolonged absence from the children, a factfinder reasonably can find endangerment to the child's physical or emotional well-being under (D) and (E)." *R.R.A.*, 687 S.W.3d at 281; *see In re M.H.*, No. 01-25-00702-CV, 2026 WL 471744, at *4 (Tex. App.—Houston [1st Dist.] Feb. 19, 2026, pet. filed)

(stating that Subsection (D) finding may be based on a pattern of drug use along with evidence of "attendant risks to employment and housing").

Relatedly, engaging in illegal conduct that can subject one to imprisonment can be part of the endangerment analysis. "While imprisonment alone is not a basis to terminate a parent's rights, it is an appropriate factor to consider because when a parent is incarcerated, he or she is absent from the child's daily life and unable to provide support to the child," negatively affecting "the child's living environment and emotional well-being." *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *see In re N.L.S.*, 715 S.W.3d 760, 765 (Tex. 2025) (stating that "mere imprisonment will not, standing alone, constitute engaging in conduct [that] endangers the . . . child," but that a parent's criminal history—considering such matters as "the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists"—is evidence that can support an endangerment finding (internal quotation marks and citations omitted)).

### C. Application

So, does the evidence in this case support an endangerment finding? We hold that it does.

First, Mother had two positive hair-strand tests for cocaine, methamphetamine, and a metabolite of marijuana, and the amount of methamphetamine and cocaine in her hair had increased by the time of the second hair-strand test, in which she also tested positive for a cocaine metabolite. Mother offered no explanation or expert

21

testimony regarding how she could have tested positive for a cocaine metabolite if she had not ingested cocaine.[15] *See, e.g.*, *In re N.T.*, No. 02-24-00067-CV, 2024 WL 2066375, at *1 (Tex. App.—Fort Worth May 9, 2024, no pet.) (noting testimony that positive test for cocaine metabolites indicated ingestion of the drug). Although Mother denied ever using cocaine or methamphetamine, the trial court could have disbelieved that testimony. As for marijuana, Mother admitted that she had used it through September 2024—that is, even after the children had been taken into care.

Moreover, before the positive drug tests, Mother was arrested for possession of methamphetamine, and the trial court could have disbelieved the testimony that she did not know that the drugs were in the car—particularly when she and Father both

---

[15]For both hair-strand tests, the drug testing service provided a test results document that stated that Mother had tested positive for cocaine metabolites. But for the first test, the accompanying lab report from the lab that had actually performed the test stated that the test was positive for "cocaine" and negative for the cocaine metabolites benzoylecgonine, cocaethylene, and norcocaine. *See Kirk v. State*, No. 01-20-00111-CR, 2021 WL 3083045, at *5 (Tex. App.—Houston [1st Dist.] July 22, 2021, no pet.) (mem. op., not designated for publication) (describing cocaethylene as a metabolite created by having cocaine and alcohol in the bloodstream at the same time); *D.L.E.B. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-19-00186-CV, 2019 WL 3721330, at *2 (Tex. App.—Austin Aug. 8, 2019, pet. denied) (describing norcocaine and benzoylecgonine as cocaine metabolites). No party presented testimony about the drug-testing process or explanations of their results, so there was no testimony about how many days or months before the testing Mother could have used the substances for which she had a positive hair-strand test. There was also no testimony about whether she could have had a false positive result for a cocaine metabolite by simply having been in the room where someone had recently used the drug.

told the police at the time of her arrest that the drugs had been in her car for a year. Additionally, the FBSS caseworker testified that when she and another caseworker removed the children, Mother appeared "possibly under[ ] the influence"; "[h]er demeanor was much different from" when the caseworker had seen her a few days prior, and she "seemed to be flush. Her eyes seemed to be glossy. She was shaky." The trial court did not have to believe Mother's denials of drug use. *See In re A.H.*, No. 02-21-00402-CV, 2022 WL 1682422, at *11 (Tex. App.—Fort Worth May 26, 2022, no pet.). Although the trial court stated at the end of trial that Mother had "clean UAs and indicated that her hair would be clean as well[,] [s]o she addressed the substance abuse issue," the court could also have believed that Mother was still downplaying her drug use at trial even after completing outpatient drug treatment as part of her services.

Further, even if Mother's positive hair-strand tests were due to external exposure rather than ingestion, then as the trial court noted, those tests would mean that Mother had chosen to spend time around drug users. *See In re D.A.*, No. 02-22-00260-CV, 2022 WL 17841133, at *10 & n.11 (Tex. App.—Fort Worth Dec. 22, 2022, pet. denied) (noting that positive test for cocaine metabolites indicated that mother had ingested the drug, and further noting that even if the trial court had not found that mother had used cocaine, the court could have reasonably found that her positive hair-strand tests showed that she had "persisted in frequenting places where people used drugs or in spending time with drug users"). Indeed, Mother's

explanation for why her car smelled like marijuana at the time of her arrest was that someone had been "recently in the car" because "someone [who they] had recently g[iven] a ride to was smoking." Combining the positive drug tests she blamed on exposure and police finding drugs in her car, the trial court could find that Mother had risked exposing her children to drugs and had risked her own imprisonment by her choices. Indeed, the trial court noted that Mother was either lying about using cocaine and methamphetamine or was choosing to be around those drugs; the court stated at the end of trial that "while [Mother] did complete drug and alcohol treatment, she never did admit to drug use and would always make an excuse for how she was exposed," so "she is either being dishonest about using drugs or she is putting herself in situations around controlled substances."

Furthermore, the testimony showed that Mother stayed in a relationship with Father even after he committed domestic violence against her. On at least one occasion, the children were in the home at the time. Moreover, Mother bailed him out of jail on numerous occasions, including after he was arrested for the incident of violence against her while the children were in the home. During the FBSS case, she violated the safety plan by having possession of the children unsupervised, which led to Father's taking the children from her care. Even after the children had been taken into care, and even after trial had begun, Mother continued to spend time with Father. Moreover, at trial, Mother continued to downplay the violence he had committed against her and others.

Considering the entire record, we conclude that the trial court could have reasonably formed a firm conviction or belief that the Department had proved at least the termination ground in Subsection (E). Because the evidence is factually sufficient to support the Subsection (E) finding, it is necessarily also legally sufficient. *See In re M.B.-O.*, No. 02-25-00306-CV, 2025 WL 3558966, at *10 (Tex. App.—Fort Worth Dec. 11, 2025, pet. denied). We overrule Mother's second issue, which challenges the Subsection (E) finding. Because only one predicate termination ground is required, *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we do not address Mother's first issue challenging the Subsection (D) finding. *See* Tex. R. App. P. 47.1.

## II. Best-interest Finding

Mother's third issue challenges the evidentiary sufficiency to support the trial court's best-interest finding.

### A. Best-Interest Factors

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code § 161.001(b)(1), (2). We also consider the

25

evidence in light of factors, set out in *Holley v. Adams*, that the factfinder may apply in its best-interest determination. 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Analysis

Although the trial court had some evidence weighing against a best-interest finding, the court had factually sufficient evidence to find that termination was in the children's best interests.

### 1. Neutral evidence

One factor that the trial court could consider was the children's desires. *Holley*, 544 S.W.2d at 371–72. However, when trial began, Braelyn was nearly five, and Brian was one year, nine months. When children are too young to express their desires, the factfinder may consider "observations of the child's interactions with parents, including any perceived 'bonding' between the child and parent." *In re L.A.*, No. 02-25-00368-CV, 2025 WL 3683989, at *9 (Tex. App.—Fort Worth Dec. 18, 2025, no pet.). Here, Mother testified that her visits with the children had gone "pretty well"

26

and were full of "loving, caring, laughing, [and] giggling." Rountree testified that initially, Mother "presented as maybe emotionless, stoic" at her visits, but that she "had gotten better" with her "engagement and her presence with the children."[16] Rountree acknowledged that in the permanency report filed shortly before trial, she reported that Mother's behavior during her visits was "healthy and appropriate."

There was no testimony regarding the children's relationship with their placement at the time of the trial court's judgment; before the final hearing date, the Department filed a motion to modify conservatorship, asking the trial court to name L.C., the children's fictive kin, as possessory conservator.[17] The Department's attorney represented to the trial court that the visits with L.C. "ha[d] gone well," but that was the extent of the information that the trial court had about the children's feelings about L.C. We cannot say that the evidence related to the children's desires weighs in favor of or against the trial court's finding.

### 2. Evidence against the finding

As for the stability of the home or proposed placement, the children's physical needs, and the plans for the children, *see Holley*, 544 S.W.2d at 371–72, the trial court heard that the children had been placed in five different foster homes during the case,

---

[16]Rountree had a more strongly positive evaluation of Father's visits with the children; she answered "very much so" when asked if the children were excited to see Father and bonded with him at the visits.

[17]The motion stated that the Department was "not waiv[ing] its request that the parental rights of [Mother] be terminated."

meaning that the Department had not provided a stable placement for the children. Further, there was some evidence that Mother could provide stability in some areas. She had a full-time job and an apartment with space for the children. She also had completed the services requested by the Department. Mother testified that she had learned in her services "not to put [her]self in certain situations, like how [her] hair follicle [had] c[o]me back jacked up, just being around certain people." She had also learned that children "can also be triggered" by being around domestic violence "just from seeing it or hearing it," and that could put them at risk for repeating the cycle. The trial court had records showing that Mother and Father had obtained dental care for Braelyn in 2022 and 2023. Evidence that Mother had a suitable home, had stable employment, had completed her services and learned from them, and had made efforts to provide for the children's physical health weighs against the trial court's finding.

### 3. Evidence supporting the finding

On the other hand, the trial court had some evidence that Mother's plans for the children were not feasible. Mother works nights, and her proposed childcare during her shift was to have the children with Father's father (Paternal Grandfather). But when Rountree had previously asked Paternal Grandfather about accepting placement of the children during the case, he had someone living with him who had a criminal history as well as a history with child protective services, and Paternal Grandfather told Rountree that he would not tell that person to move out. Mother

28

presented no evidence that Paternal Grandfather had since removed that person from his home.

There was also no testimony that Paternal Grandfather's home had room for the children. When Rountree had spoken with him about being a possible placement during the case, he said that he had no space for them. Father's attorney asked her if it was true that Paternal Grandfather had planned to put in bunk beds for the children, but Rountree testified that it was not true.[18] Mother did not offer any evidence of other alternative plans for caring for the children while she worked other than having Paternal Grandfather keep the children overnight. This evidence weighs in favor of the trial court's finding. Additionally, as of the time of trial, Mother still had a pending felony charge for possession of methamphetamine, *see* Tex. Health & Safety Code § 481.115(a), (c), which created some degree of uncertainty about the future, *see* Tex. Penal Code § 12.34 (providing punishment range for third-degree felony).[19]

---

[18]In Mother's attorney's subsequent questioning of Rountree, the attorney asserted, "[W]e did hear some testimony earlier that [Paternal Grandfather] was willing to put bunk beds in his place for the children. Do you remember hearing that?" Rountree testified, "Yes, ma'am." But in fact, what Rountree had heard earlier was not testimony on that point but rather Father's attorney's questioning. The only testimony on the issue was Rountree's testimony that Paternal Grandfather had no such plans.

[19]Based on the record before this court, Mother appeared to be eligible for deferred-adjudication community supervision. *See* Tex. Code Crim Proc. art. 42A.102(b).

Further, as noted, the Department had filed a motion to have a fictive kin placement named as possessory conservator. At the last hearing, the Department's attorney informed the trial court that a home study for that person had been approved, the children had already had visits with her, and the placement was willing to adopt the children.[20] The Department's attorney stated that the person had a relationship with Mother, "which is good, and so she could allow [Mother], if she fe[lt] like [Mother] was safe, to have some contact with the children." The children's attorney ad litem told the trial court that the person would be "a positive placement": "I think she'll be very protective, and so I'm very much in support of that placement. I also am in support of termination as well." Mother expressed no concerns with that placement; her attorney expressed her opposition to termination but also stated that if the trial court found that termination was in the children's best interest, then Mother did not oppose placement with that fictive kin. Thus, there was no dispute that the proposed placement was suitable for the children.

The trial court could also consider the children's emotional and physical needs at the time of trial and in the future. *See Holley*, 544 S.W.2d at 371–72. Although Mother and Father had provided some medical and dental care for the children in the past, the Department also presented evidence that Braelyn had needed extensive

---

[20]Mother's brief states that the children's current placement is not interested in adoption, but while that was true of their placement when trial began, it was not true of L.C., the fictive kin with whom the children were placed at the end of trial.

dental work after she came into care. Further, although the trial court had some evidence that the kids had suffered some medical issues while in care—a blister and diaper rash on Brian and scalp issues with Braelyn—there was no evidence of any serious concern. Mother noticed the blister during a visit, something that had not been noticed by the foster parents or the day care. Rountree testified that after Mother brought it to her attention, the Department had "assess[ed] how it happened," and although the caseworker did not explain what she had learned in that assessment, she testified that she had no concerns about abuse by the foster parents. As for the diaper rash, the caseworker testified that it was due to his having had issues with diarrhea. Finally, as for the concerns about Braelyn's scalp, the foster parent "produce[d] medical documents and a prescription" that showed that the issue was already being treated by a doctor.

Regarding the children's emotional needs, *see id.*, Rountree testified that Braelyn had "entered care with limited expressive language," with the Department having "concerns about her possibly being on the spectrum[ and her] ability to fully adapt and function normally in, like, regular environments and in the foster homes that [the Department was] placing her in." Although Rountree acknowledged that it was possible that Braelyn's behavioral issues were "related to her placement[s]," she also stated that the issues existed when Braelyn entered care. When Rountree talked to Mother about the concerns, Mother "said that [the concerns] weren't there before" but that "[the maternal grandmother] primarily dealt with a lot of [Braelyn's]

31

behavioral concerns." From the testimony, the trial court could have believed that Braelyn had behavioral concerns before she entered care—issues that may or may not have been exacerbated by her placements—and that Mother had failed to recognize the concerns and had no experience in addressing them. That evidence weighs in favor of the trial court's finding. *See In re S.M.O.*, No. 04-24-00253-CV, 2024 WL 4280991, at *3 (Tex. App.—San Antonio Sept. 25, 2024, pet. denied) (noting that father's reluctance to accept child's developmental delay weighed in favor of best-interest finding). Mother did take parenting classes as part of her services, but Rountree testified that the children did not have behavioral issues during their visits with Mother during the case, so the trial court had no evidence as to whether the classes had helped Mother—or had not helped her—learn how to address Braelyn's issues.

Additionally, the trial court had evidence related to Mother's endangering the children by staying with them in a home with Father despite his violent acts toward her. *See Holley*, 544 S.W.2d at 371–72 (listing emotional and physical danger to the children at the time of trial and in the future as a best-interest factor). We recognize that it can be difficult—and sometimes dangerous—for a domestic-violence victim to leave an abuser. But the concern in this case was not that Mother did not have the resources or ability to end her relationship with Father sooner than she did. The concern was that Mother did not seem to recognize the seriousness of the situation

32

and its potential effect on her children. While Mother is not responsible for Father's violence against her, the trial court could consider her reaction to it.

Indeed, the trial court had evidence that Mother continued to choose to spend time with Father even after he moved out during the FBSS case and even after the children had been taken into care based in large part on his violent acts. As we noted, Mother was found driving with Father—with her letting him drive her car—months after their children had been taken into care, a situation that led to her arrest. Then, during trial, she was again caught with Father in her car, which she again had let him drive, apparently leading to his arrest for driving while intoxicated.

The trial court also could consider that Mother had displayed a curious lack of interest in learning more about Father's other criminal offenses, including an incident of domestic violence against the mother of his other children and violent conduct toward the father of her other children. Moreover, the trial court could infer from Mother's minimizing Father's violence in her testimony that she did not truly recognize the danger to her children from such violence and that she therefore could not adequately protect her children from it and perhaps did not recognize the need to do so. *See Holley*, 544 S.W.2d at 371–72 (considering parental abilities of individual seeking custody); *In re A.M.*, No. 02-24-00199-CV, 2024 WL 4157766, at *16 (Tex. App.—Fort Worth Sept. 12, 2024, pet. denied) (noting in best-interest analysis evidence that mother could not protect herself, "much less anyone else," from abusive partner). This evidence weighs in favor of the best-interest finding.

Mother's being stopped by police in the car with Father during trial also undermined her testimony that she had learned "not to put [her]self in certain situations." Thus, even if the trial court had believed that Mother's positive hair-strand tests had resulted from her spending time around others using drugs, the trial court could believe that Mother had still not learned to be careful about the persons with whom she socialized.

Further, also relevant to evaluating potential danger to the children was the evidence of Mother's drug use. If the trial court believed that Mother's positive drug tests indicated that she had used illicit drugs, the court could have then further found that her trial testimony that she had never used those drugs was an indication that she was not serious about staying sober and that she could not be trusted to not endanger the children in the future by using illegal drugs. Likewise, if Mother had been choosing to be around users of illegal drugs, that choice had put her at risk of imprisonment and of losing her parental rights, and the trial court did not have to credit her testimony that she had learned to be more careful about who she spent time with—particularly when Mother was caught again spending time with Father during trial. This evidence weighs in favor of the trial court's best-interest finding. *See In re A.E.*, No. 05-14-01340-CV, 2015 WL 1184179, at *7 (Tex. App.—Dallas Mar. 16, 2015, pet. denied) (noting that trial court could consider in its best-interest analysis mother's choice to minimize past drug use and her history of being in abusive relationships).

### 4. Conclusion

The trial court had some evidence from which it could find that Mother could provide some stability to the children in that she had a place to live and a job. Further, Father's unfortunate death during the case meant that there could no longer be any issue with Mother choosing him over the children.

On the other hand, by the last day of trial, the Department had found a fictive kin placement for the children, and all parties agreed that the placement was suitable. If the trial court believed the caseworker's testimony that Braelyn had behavioral issues when she came into care, then the trial court could also believe that Mother was unaware of those issues or was unable to address them. Most importantly, despite Mother's receiving counseling and other services, she continued to minimize Father's violent history as well as her drug use or her association with drug users. When a parent has endangered a child, the parent's failure to recognize and rectify that endangerment raises serious concerns about the parent's willingness and ability to protect the child from danger in the future. Here, the trial court could find from the evidence that the Department was correct in concluding that Mother could not be trusted to be protective of the children.

Considering the entire record, we hold that the trial court could form a firm conviction or belief that the Department had proved that termination would be in the children's best interest. Because the evidence was therefore factually sufficient to

support the best-interest finding, it was therefore also legally sufficient. *See M.B.-O.*, 2025 WL 3558966, at *10. We overrule Mother's third issue.

## Conclusion

Having overruled Mother's second and third issues, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: June 4, 2026